# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

THELMA LAYTON

VERSUS

STATE OF LOUISIANA

CV. NO. 14-722-JWD-EWD

JUDGE JOHN W. deGRAVELLES

## RULING AND ORDER

### I. INTRODUCTION

Before the Court is Defendant the State of Louisiana's Motion for Summary Judgment. ("Motion," Doc. 71). Plaintiff Thelma Layton has filed an Opposition, (Doc. 75), and Defendant has filed a Reply in further support of the Motion. (Doc. 78).

The Court has reviewed the briefing and is prepared to rule. For the reasons set forth below, Defendant's Motion is granted in part and denied in part.

### II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff started working at the Louisiana State Penitentiary in Angola, Louisiana ("Angola") in October 2009. (Doc. 71-4 at 9). As part of working at Angola, Plaintiff agreed to work any post or shift to which she was assigned. (Doc. 71-22 at 2).

While she was working at Angola, Plaintiff was assigned to staff various dorms. (Doc. 71-4 at 13-14). She was frequently staffed to a dorm while Major Willie Thomas was doing rounds; if Thomas came to her dorm while doing rounds by himself, which he did at least three times a week, he would often comment that he was "doing without." (Doc. 71-4 at 12-16). Although he never "c[a]me right out" and said so, Plaintiff ultimately came to believe that Thomas was referencing "doing without" sex because on one occasion Thomas also said that Plaintiff's husband "must not care for [her]" but Thomas "like[d] watching [her] ass." (Doc. 71-4 at 13, 16-17).

Additionally, on one occasion, Plaintiff asked to be relieved of some aspects of performing rounds because she was injured, and Thomas responded, "I'm still doing without, and if you don't like it, quit." (Doc. 71-4 at 20-21). During her deposition, Plaintiff confirmed that these were Thomas's only allegedly harassing statements. (Doc. 71-4 at 22). In an affidavit, Thomas contends that "doing without" referred to "doing without a raise and doing without money" as a state employee; he makes this statement to "just about everyone" who asks how he is, including men and women; and he did not make any statements about Plaintiff's "ass." (Doc. 71-8 at 2).

At her deposition, Plaintiff stated that Thomas's comments began around January 2012, but she did not recall the date of the comment about her "ass." (Doc. 71-4 at 16-18). Thomas made the comment about quitting in January 2013. (Doc. 71-4 at 21). According to Plaintiff, Thomas did not make these comments in the presence of other officers and may not have made them loudly enough that inmates could hear. (Doc. 71-4 at 18-19, 22). Plaintiff never told Thomas not to make the comments. (Doc. 71-4 at 22-23). She also initially did not say anything to anyone about the comments because she feared losing her job. (Doc. 71-4 at 23).

Plaintiff filed a complaint about Thomas's comments with Angola's human resources department on June 13, 2013. (Doc. 71-4 at 23-24). She spoke with a human resources representative and an investigator and wrote a statement. (Doc. 71-4 at 24-25). On or about June 27, 2013, Plaintiff was reassigned to the "west yard" for about a day, then to Camp D, an "out camp." (Doc. 71-4 at 26, 29-31; Doc. 71-15 at 2). When she called to ask about her reassignments, she was told that she was "fixing to be permanently moved to an out camp." (Doc. 71-4 at 26). She also called her immediate supervisor, but, because he was unavailable, she spoke to Warden Kevin Benjamin, the next supervisor up the hierarchy, about the reassignments. (Doc. 71-4 at 26-27). Benjamin told her that the prison was "through with [the] mess" of having Thomas and

Plaintiff work together. (Doc. 71-4 at 26-27). Plaintiff also believes that Benjamin wanted her to be reassigned, as he told Plaintiff that she "shouldn't have even gone to human resources to report anything without reporting it to him first," even though Plaintiff had tried to reach him earlier by leaving daily messages with his secretary. (Doc. 71-4 at 32-34). In an affidavit, Benjamin claims that he was not involved in the reassignment decision. (Doc. 71-7 at 1). A letter discussing the reassignment to Camp D says that it occurred "to better utilize existing personnel." (Doc. 71-15 at 2).

A human resources representative told Plaintiff that the assignment to Camp D should not matter if it was the "same kind of work," but Plaintiff claimed that working at Camp D was a "dangerous environment" where "murder has gone down," and that she was writing up "21's," which are assessed when a prisoner masturbates in front of a guard, "all day long." (Doc. 71-4 at 27-29). Plaintiff did not receive reduced pay or rank as a result of her reassignment, and she testified that, aside from more frequent "wolf whistles" and writing up prisoners for masturbating, her job duties were the same. (Doc. 71-4 at 36-38).

At some point, Plaintiff asked to be reassigned to the main prison, and she was reassigned there on a shift opposite Thomas's in August 2013. (Doc. 71-4 at 29, 31-32, 40-41). Benjamin's affidavit claims that he was not involved in this decision either. (Doc. 71-7 at 1). A letter discussing the reassignment says that it occurred "to better utilize existing personnel." (Doc. 71-16 at 2).

Plaintiff claims that, following the reassignment back to the main prison, Benjamin "treated [her] differently," calling her into his office for "this or that" without a good reason and trying to embarrass her "in front of everybody." (Doc. 71-4 at 42-46). During her deposition, Plaintiff clarified that her claims regarding Benjamin's conduct involved three different incidents, the first

of which was the previously-described exchange between Plaintiff and Benjamin concerning Plaintiff's reassignment to Camp D. (Doc. 71-4 at 51).

In Plaintiff's second run-in with Benjamin, she and another officer accidentally took each other's jackets and Benjamin called Plaintiff into his office to discuss various papers that had been discovered in Plaintiff's jacket. (Doc. 71-4 at 44-49). Plaintiff believes that Benjamin asked about the papers because he thought that Plaintiff might be corresponding with an inmate. (Doc. 71-4 at 50). Benjamin's affidavit confirms that "standard procedure is to investigate [paper with phone numbers]," but if an officer can show that the numbers do not belong to an inmate and justify why the officer has them, the officer will not be disciplined. (Doc. 71-7 at 2). During that incident, Plaintiff asked Benjamin why he was always particularly "hard on [Plaintiff]," and he was unable to answer. (Doc. 71-4 at 49-50).

During the third incident, which occurred in October 2014, Plaintiff was smoking outside the kitchen and, according to Plaintiff, she handed a cigarette butt to an inmate, intending that the inmate would throw it away. (Doc. 71-4 at 52-53). Shortly afterward, Plaintiff heard a "big commotion" about how she had given an inmate contraband. (Doc. 71-4 at 54). Plaintiff went to Sergeant Danielle Daigle's office and said that Plaintiff "do[es]n't do" contraband. (Doc. 71-4 at 54-55). Daigle "started hooting and hollering and screaming about, you're out of here, you're out of here." (Doc. 71-4 at 55). Plaintiff asked what Daigle meant, and Daigle walked over to Plaintiff and "pushed on" Plaintiff. (Doc. 71-4 at 55). Plaintiff pushed Daigle's hand off her shoulder, and Daigle said that she would tell a supervisor, Major Hooker, that Plaintiff pushed her. (Doc. 71-4 at 55). According to an employee statement and later affidavit by Daigle, she saw Plaintiff "smile[]" at an inmate and "slip[]" what appeared to be a cigarette into his hand, and, after Daigle reported to a lieutenant that Plaintiff gave "something" to an inmate, Plaintiff confronted Daigle,

"pointed [her] finger in [Daigle's] face" and "yell[ed]" that Daigle had reported that Plaintiff was giving inmates contraband. (Doc. 71-9 at 2; Doc. 71-19 at 2-3). Daigle further reported that Plaintiff pushed her, and Daigle "brushed" or "pushed" her hand off. (Doc. 71-9 at 2; Doc. 71-19 at 3).

Hooker and a colonel walked in shortly afterward, and the colonel said "get out, get out, get out, just get your stuff and go." (Doc. 71-4 at 55-56). Plaintiff went to Hooker's office and wrote a statement, which Hooker sent to Benjamin. (Doc. 71-4 at 56). Benjamin sent for Plaintiff and said that he did not have a problem with her giving an inmate a cigarette, because "we give them cigarettes anyway," but Plaintiff should not try to get anyone in the kitchen to be a witness for her. (Doc. 71-4 at 56, 73-74).

Later on the same day, Plaintiff went to human resources, where Benjamin was present; Benjamin told her that he was sending her home because she had caused such a "big commotion," and that she should come back with her "lawyer and a witness." (Doc. 71-4 at 57). According to Plaintiff, while she was out shopping that day, she encountered Sergeant Bernice Cavalier, a witness to the incident, and Cavalier said that "they tried everything in their power to turn [Cavalier] against [Plaintiff] today." (Doc. 71-4 at 57). According to Plaintiff's account, Cavalier agreed to act as Plaintiff's witness. (Doc. 71-4 at 58). An employee statement and later affidavit by Cavalier, however, stated that Plaintiff told Cavalier that she had given a cigarette to an inmate to hold and Daigle had reported it. (Doc. 71-10 at 1; Doc. 71-17 at 2). According to Cavalier's account, Daigle and Plaintiff were pointing at each other during the confrontation; Cavalier turned away and, when she turned back, she saw Daigle "fall back." (Doc. 71-10 at 1-2; Doc. 71-17 at 2). It appeared to Cavalier that Plaintiff had pushed Daigle, although she did not witness the push. (Doc. 71-10 at 1-2; Doc. 71-17 at 2).

Plaintiff was written up and fired for giving an inmate a cigarette and pushing Daigle. (Doc. 71-4 at 61). According to an affidavit by Major Michele Piazza, then Plaintiff's direct supervisor, Piazza received reports that Plaintiff had given an inmate "something" and had pushed Daigle "after getting in Daigle's face," and Piazza issued the Rule Violation Report associated with the incident. (Doc. 71-12 at 1-2; *see also* Doc. 71-13 at 2 (Rule Violation Report bearing Piazza's signature and alleging violations of rules concerning "Malfeasance Aggravated" and "Unauthorized Activities with Offenders")). Benjamin signed the Rule Violation Report as the "Review Officer" and recommended termination. (Doc. 71-4 at 61; *see also* Doc. 71-13 at 2). Benjamin's affidavit states that giving a cigarette to an inmate and pushing another officer are both very serious offenses, and that Benjamin believed that termination was the proper course of action "[w]ith the violations all occurring practically at once." (Doc. 71-7 at 2).

Plaintiff appealed and obtained a "second level hearing" with another warden, who upheld the termination and said that he would "get on" Daigle for "entertaining" Plaintiff. (Doc. 71-4 at 61-62). Plaintiff appealed the termination further, but she was unsuccessful. (Doc. 71-4 at 62-63).

Plaintiff believes that she was terminated because she filed a sexual harassment complaint against Thomas, and Thomas and Benjamin were "real good friends." (Doc. 71-4 at 63). Plaintiff also claimed at her deposition that she was fired for a single violation while others with "stacks" of infractions, including Daigle, have not been fired. (Doc. 71-4 at 63).

Although Plaintiff's Supplemental and Amended Complaint is not entirely clear, it appears to allege that Thomas sexually harassed her and that her assignment to Camp D, as well as Benjamin's actions following her reassignment back to the main prison and the circumstances of her termination, were retaliatory. (Doc. 45 at 3, 5-7, 9-10). Plaintiff also contends that she, an

African American female, was terminated as a result of the confrontation, while Daigle, who is white, received a warning. (Doc. 45 at 14).

### III. DISCUSSION

#### A. General Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

#### B. Parties' Arguments

##### a. The Motion for Summary Judgment

In its Motion, Defendant first argues that Plaintiff fails to state a quid pro quo sexual harassment claim because she has not identified a tangible employment action that she suffered as

a result of accepting or refusing Thomas's alleged advances. (Doc. 71-1 at 5-7). Next, Defendant contends that Plaintiff has not shown that any harassment complained of was based on sex; the harassment affected a term, condition, or privilege of her employment; or that Defendant failed to take prompt remedial action. (Doc. 71-1 at 7-11). Specifically, Defendant argues that: (1) Plaintiff cannot show that Thomas's "doing without" comments were related to sex, and he otherwise made one stray comment about her "ass"; (2) Thomas's comments were neither "objectively nor subjectively abusive," nor was the single comment about her "ass" "severe or pervasive"; and (3) upon being informed of Plaintiff's complaint, Defendant removed Plaintiff from Thomas's chain of command and assigned her to another area of the prison. (Doc. 71-1 at 7-11).

In addressing Plaintiff's retaliation claims, Defendant first contends that her transfer to Camp D and Benjamin's questioning about the papers in her jacket were not "adverse employment actions." (Doc. 71-1 at 13-14). With respect to her termination, Defendant argues that it did not deviate from its "customary policies" in firing Plaintiff and that the temporal lapse between her protected activity and termination is too great to support a retaliation claim. (Doc. 71-1 at 15-16). Defendant also argues that it had legitimate, non-retaliatory reasons to act as it did: in reassigning her to Camp D, it was responding to her complaints of sexual harassment; it is standard procedure to investigate phone numbers or correspondence that may have been received from an inmate; and Plaintiff violated prison regulations concerning giving things to offenders and violence between employees. (Doc. 71-1 at 16-18).

Defendant also argues that any claim for punitive damages is barred by Title VII. (Doc. 71-1 at 18).

### b. Plaintiff's Opposition

In her Opposition, Plaintiff argues that Daigle received a verbal reprimand, but Plaintiff, "a black female with a pending sexual harassment claim against her superior officer, [was] terminated." (Doc. 75 at 3, 11-12). In a section entitled "Disparate Treatment," Plaintiff argues that, according to prison policy, all participants in an incident of aggression are to be dealt with severely regardless of who the aggressor is. (Doc. 75 at 11-15).

Plaintiff also contends that it is a dispute of material fact whether Thomas's "doing without" comments referred to money or sex and that she was moved to a "more harsh and dangerous workplace" and subjected to "extra scrutiny" as a result of her complaints. (Doc. 75 at 4). Plaintiff further argues that the cigarette butt itself was not "contraband," that officers sometimes give inmates cigarettes, and that whether inmates are permitted to have cigarettes is a disputed issue of fact. (Doc. 75 at 5-7). Plaintiff also contends that there is a dispute about whether she called Daigle a "whore" during the confrontation and about who pushed who. (Doc. 75 at 7-10).

In support of the Opposition, Plaintiff attaches her own affidavit claiming, *inter alia*, that Thomas's comments were accompanied by a "sexually suggestive if not perverted" "look" and that, apparently on multiple occasions, Plaintiff complained to Thomas about her difficult work assignments and Thomas said "if you don't like it quit because I'm still doing without." (Doc. 75-1 at 1-2). The affidavit also describes additional ways in which Plaintiff's work environment allegedly worsened following her complaints, including "vulgar name calling" by Thomas's friends, assignment to unspecified "difficult tasks" in violation of a doctor's order for limited duty, and a comment by Daigle that she would try to get Plaintiff fired "if it was the last thing she did."

(Doc. 75-1 at 3). Plaintiff also attaches a hearing transcript and other documents from civil service proceedings in support of the Opposition. (Doc. 75-2).

### c. Defendant's Reply

In its Reply, Defendant observes first that Plaintiff failed to provide a statement of disputed facts and that the Opposition generally does not cite to record evidence in this case. (Doc. 78 at 1-2). Defendant also argues that Plaintiff's affidavit should be struck, as it does not state that it was based on her personal knowledge, was not properly notarized, contains numerous hearsay or conclusory statements, and is generally a "sham affidavit" contradicting prior deposition testimony. (Doc. 78 at 2-3). Defendant further maintains that the civil service documents should not be considered as they are "hardly relevant" and the transcript is "rife with evidentiary issues." (Doc. 78 at 4). To the extent that Plaintiff may be trying to state a disparate treatment claim, Defendant argues that this claim has not been properly raised before this Court and is unexhausted. (Doc. 78 at 4). Otherwise, Defendant generally reiterates arguments made in its Motion. (Doc. 78 at 4-5).

### C. Analysis

#### a. Plaintiff's Affidavit and the Civil Service Documents

First, the Court considers Plaintiff's affidavit and the civil service documents. Defendant argues that these filings should be struck because the affidavit contains conclusory statements or statements that contradict prior deposition testimony and the transcript is irrelevant and has "evidentiary issues." (Doc. 78 at 3-4). Preliminarily, the Court denies the request to strike with respect to any statements not specifically addressed below, as the statements either concern issues that are only tangentially related to whether summary judgment is proper or ones that do not change the disposition of Defendant's Motion. *See, e.g., Donihoo v. Dallas Airmotive, Inc.*, 1998 WL

574770 at *2 (N.D. Tex. Aug. 31, 1998) ("As a preliminary matter, the Court must consider [the] defendant's motion to strike portions of [the] plaintiff's response. Specifically, [the] defendant asserts that the third paragraph in the relevant facts section of [the] plaintiff's response is a factual contention which lacks evidentiary support. Because the Court has found it unnecessary to rely upon the statements contained in paragraph three of the response, [the] defendant's motion to strike is denied as moot." (capitalization altered)).

Plaintiff's affidavit denies "[e]ach and every allegation of [Defendant's] [M]otion" as "false or fabricated allegations." (Doc. 75-1 at 1). The Court agrees with Defendant that this general, conclusory allegation is insufficient to defeat a summary judgment motion and should not be considered. *See Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) ("Mere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment.").

Plaintiff contends that Thomas's "doing without" comments were accompanied by a "sexually suggestive if not perverted" "look" that "clearly said to [Plaintiff] he meant that in a sexual way" and made Plaintiff "very uncomfortable." (Doc. 75-1 at 1). Plaintiff also states that Thomas "knew he made [Plaintiff] uncomfortable," changed her assignments to be more difficult when she would not "comply or be receptive" to him, and repeatedly told her that she could quit if she did not like it because he was still "doing without." (Doc. 75-1 at 2). The Court will not consider these statements, as they directly contradict Plaintiff's deposition testimony concerning the number and nature of Thomas's comments and actions. Indeed, later in the same affidavit Plaintiff reiterates that the "ass" comment "linked all of [Thomas's] prior conduct and statements together showing [Plaintiff] that he meant it all in a sexually suggestive manner," (Doc. 75-1 at 2),

undermining Plaintiff's claim that each comment was accompanied by a "look" making it clear that the comment was sexually suggestive.

Plaintiff's affidavit also contains numerous statements about "name calling" and similar "hostile retaliatory" treatment by co-workers, including assignment to unspecified "difficult tasks" in violation of a doctor's order for limited duty and a comment by Daigle that she would try to get Plaintiff fired "if it was the last thing she did." (Doc. 75-1 at 3). These allegations are inconsistent with Plaintiff's deposition testimony, where she did not describe these events as among the things that happened to her "because [she] complained about sexual harassment against [Thomas]." (Doc. 71-4 at 65). Therefore, the Court will not consider these allegations.

Finally, the Court agrees with Defendant that the civil service documents should not be considered. Plaintiff acknowledges that the hearing's evidentiary rules are more relaxed than those applicable in this proceeding. (Doc. 75 at 5 ("It's hearsay but hearsay is allowed in these hearings according to the statement of the Referee.")). Moreover, the civil service proceedings overwhelmingly addressed factual disputes that the Court must already assume would be resolved in Plaintiff's favor and different legal issues than those currently before the Court. (*See, e.g.*, Doc. 75-2 at 24 (referee's statement of appeal stating that Plaintiff's civil service appeal principally alleged "racial discrimination and disparate treatment")). Therefore, the civil service documents will not be considered.

### b. Sexual Harassment Claims

The Court now considers Plaintiff's sexual harassment claims. There are two forms of sexual harassment claims under Title VII: quid pro quo and hostile work environment. *See Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002).

To state a claim for quid pro quo harassment, a plaintiff must establish that she suffered a tangible employment action that resulted from her acceptance or rejection of a supervisor's alleged sexual advances. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998). To state a hostile work environment claim, a plaintiff must establish that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment complained of affected a term, condition or privilege of employment; and (5) the employer knew or should have known about the harassment and failed to take prompt remedial action. *Farpella-Crosby v. Horizon Health-Care*, 97 F.3d 803, 806 (5th Cir. 1996). To affect a term, condition or privilege of employment, the harassment "must be sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

The Court agrees with Defendant that Plaintiff cannot state a plausible sexual harassment claim. With respect to a quid pro quo theory, Plaintiff provides no meaningful argument or evidence that one of Defendant's employees took a tangible employment action against her that was conditioned on receiving sexual favors. (*See* Doc. 75 at 18 (emphasizing that Thomas allegedly "created a sexually hostile work environment for Plaintiff")); *see also King v. Interstate Hotels & Resort*, 2016 WL 1735881, at *2 (M.D. La. May 2, 2016); *Curry v. Lou Rippner, Inc.*, 2015 WL 2169804, at *4 (E.D. La. May 8, 2015). Thomas's denial of Plaintiff's request to be relieved of some of the more strenuous aspects of performing rounds, (Doc. 71-4 at 20-21), does not rise to the level of a "tangible employment action." *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Watts v. Kroger*

*Co.*, 170 F.3d 505, 510 (5th Cir. 1999) ("Simply changing one's work schedule is not a change in her employment status. Neither is expanding the duties of one's job as a member of the produce department to include mopping the floor, cleaning the chrome in the produce department, and requiring her to check with her supervisor before taking breaks."). Plaintiff's reassignment to Camp D presents a closer question, but Plaintiff does not allege that Thomas's alleged sexual advances were premised upon a threat that he would reassign her to Camp D if she refused him. Instead, Plaintiff claims that she was assigned in retaliation for complaining about Thomas. This argument is addressed *infra*, but it defeats any allegation that simply rejecting Thomas's advances was the cause of her reassignment. *Jones v. Flagship Intern.*, 793 F.2d 714, 722 (5th Cir. 1986) ("[T]he record fails to establish that Jones was required to accept sexual harassment as a condition to the receipt of a job benefit."); *see also Coe v. N. Pipe Prod.*, Inc., 589 F. Supp. 2d 1055, 1104 (N.D. Iowa 2008) ("Coe does not allege that any job benefit or job detriment was expressly or even impliedly made contingent upon her acceptance or rejection of the alleged sexual advances by Burger, only that job detriments later followed from her failure to respond favorably to Burger's advances. Thus, at the time of the alleged sexual advances, and her refusal of them, Coe could not have reasonably believed that she was being subjected to quid pro quo harassment." (citation omitted)).

Plaintiff's hostile work environment claims also fail. Thomas allegedly made one overtly sexual comment about Plaintiff's "ass" during their time working together. "Offhand comments" and "isolated incidents" generally do not suffice to alter the "terms and conditions of employment." *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 445 (5th Cir. 2017). While Thomas's comments regarding "doing without" were far more frequent, these comments were so oblique and attenuated that Plaintiff did not even recognize them as sexual harassment absent the comment about her

"ass." Such statements fall short of the high standard that a cognizable hostile work environment claim must meet. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."); *see also Dortch v. Mem'l Herman Healthcare Sys.-Sw.*, 525 F.Supp.2d 849, 874 (S.D. Tex. 2007) ("[H]ostile work environment cases have traditionally set a high bar for the amount and type of proof necessary to proceed on the claim.").

Additionally, Plaintiff acknowledges that no one heard the allegedly harassing comments for some time, and she did not initially report them to anyone. While Plaintiff may contest the propriety of the reassignment, which goes to her retaliation allegations, it appears uncontested that, shortly after Plaintiff first complained about Thomas's comments, Plaintiff was reassigned and did not work with him further. This undermines Plaintiff's showing that Defendant "knew or should have known about" Thomas's conduct and failed to take action.

For the foregoing reasons, Plaintiff fails to state a sexual harassment claim. Defendant's Motion will be granted with respect to Plaintiff's sexual harassment claims.

### c. Retaliation Claims

The Court now turns to Plaintiff's retaliation claims. Title VII prohibits discrimination against an employee in retaliation for the employee's opposition to an employer's discriminatory practices. 42 U.S.C. § 2000e-3(a). To state a claim of retaliation under Title VII, a plaintiff must allege that: (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a "causal link" between the two events. *Evans v. City of Hous.*, 246 F.3d 344, 351 (5th Cir. 2001). Defendant acknowledges that Plaintiff engaged in protected

activity when she filed an internal sexual harassment complaint on June 13, 2013 and a first EEOC charge on November 22, 2013. (Doc. 71-1 at 12).

The Court agrees with Defendant that the "coat-searching" incident does not constitute an "adverse action" for purposes of a retaliation claim. Title VII's retaliation provision covers employer actions materially adverse to a reasonable employee, that is, actions that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67-68 (2006); *Aryain v. Wal–Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008).[1] However, chastisement by superiors and ostracism from co-workers "do not rise to the level of material adversity but instead fall into the category of 'petty slights, minor annoyances, and simple lack of good manners' that the Supreme Court has recognized are not actionable retaliatory conduct." *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) (citing *White*, 548 U.S. at 68). During the "coat-searching" incident, Plaintiff was called into Benjamin's office and questioned about papers in her pocket. Plaintiff may have suffered humiliation or embarrassment, but it does not appear that Plaintiff was written up or disciplined for the incident. These allegations fall squarely into the latter category: at most, Plaintiff experienced "chastisement by superiors" that is not actionable retaliatory conduct.

With respect to Plaintiff's allegations about her termination, the principal issue is causation. In a retaliation case, "[t]here are three indicia of causation: (1) the absence of any reference to the conduct at issue in the employee's disciplinary record, (2) deviation from the employer's customary 'policy and procedures in terminating the employee,' and (3) temporal proximity between the termination and protected conduct." *Pryor v. MD Anderson Cancer Ctr.*,

---

[1] The Supreme Court has abrogated the Fifth Circuit's earlier requirement that a plaintiff making a retaliation claim prove that she was subject to an "ultimate employment decision." *Aryain*, 534 F.3d at 484 n.9.

495 F. App'x 544, 547 (5th Cir. 2012) (citing *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994)).

Here, Plaintiff has made an inadequate showing of causation. First, Plaintiff's protected activity occurred in June and November 2013, and her termination occurred in October 2014. Although an eleven-month gap does not prove that there was no retaliation, it suggests that a retaliatory motive was "highly unlikely" absent other evidence. *Cf. Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 268 (5th Cir. 1994) (ten-month gap did not support inference of retaliation and suggested that a retaliatory motive was "highly unlikely"). Additionally, Angola policy prohibits both giving items to inmates and violent conduct among employees, and Plaintiff's Rule Violation Report states that she was terminated for violating these policies. (Docs. 71-13 at 2; 71-14 at 2-3; 71-20 at 2; 71-21 at 40-41). Even assuming that inmates are sometimes given cigarettes,[2] Plaintiff was still charged by several officers with pushing and acting aggressive toward Daigle in addition to giving a cigarette to an inmate; although Plaintiff has provided an alternative account of the incident, she has provided insufficient evidence that the other accounts were not only incorrect but tainted by retaliatory animus. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325 (5th Cir. 2002) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."); *see also Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 661 (5th Cir. 2012) (in evaluating claim that plaintiff was treated less favorably than similarly situated employees in attempt to state retaliation claim, Fifth Circuit "follow[ed] the district court's lead in giving considerable weight to [plaintiff's] admission

---

[2] Plaintiff discusses at length whether a cigarette is "contraband," (Doc. 75 at 4-7), but according to record affidavits the primary problem underlying Plaintiff's termination was a prison officer allegedly giving something of value to an inmate, whether contraband or not. (*See, e.g.*, Doc. 71-7 at 2). While officers may sometimes give cigarettes to inmates, such conduct is prohibited by Angola policy. Moreover, Plaintiff has not shown how often the practice occurs and how frequently guards who violate this provision are punished if caught.

that he committed the acts for which he was discharged, that those acts violated the workplace policy, and the formal grievance committee upheld his discharge"). Plaintiff's primary evidence in support of her claim of retaliation in connection with her discharge is her own statement that Thomas and individuals who allegedly retaliated against her are "good friends." (Doc. 71-4 at 64). Given the amount of time that passed between Plaintiff's protected conduct and her termination, the number of individuals who witnessed the incident and were involved in the termination decision, and the dearth of other evidence in support of causation, Plaintiff has failed to state a valid retaliation claim in connection with her termination. Defendant's Motion will be granted with respect to any such claim.

The Court views Plaintiff's allegations concerning her reassignment differently, however. Plaintiff testified at her deposition that Camp D was a "dangerous environment," because "murder has gone down back there," and that working in Camp D involved writing prisoners up for masturbating "all day long." (Doc. 71-4 at 28-29). Plaintiff also testified that, when she asked about her assignment to Camp D, which occurred only a few weeks after her initial complaint, she was told that she was "fixing to be permanently moved to an out camp" and that the prison was "through with [the] mess" of having Thomas and Plaintiff work together, (Doc. 71-4 at 26-27), and that Benjamin objected to Plaintiff reporting misconduct to human resources without reporting it to him first. (Doc. 71-4 at 32-34). Based on this testimony, a reasonable jury could conclude that the threat of assignment to Camp D might have dissuaded a reasonable employee from making or supporting a charge of discrimination and that there was a "causal connection" between Plaintiff's complaint and her reassignment to this less desirable work. *See White*, 548 U.S. at 67 (retaliation claim had support where "the track laborer duties were by all accounts more arduous and dirtier; [] the forklift operator position required more qualifications, which is an indication of

prestige; and [] the forklift operator position was objectively considered a better job and the male employees resented White for occupying it"); *Aryain*, 534 F.3d at 484.

Defendant argues that it has also provided a legitimate, non-retaliatory reason for reassigning Plaintiff, *i.e.*, the need to move Plaintiff away from her alleged harasser. (Doc. 71-1 at 16-17). However, several of the statements allegedly made in connection with the reassignment suggest that the prison's decision was based principally on frustration with Plaintiff filing a formal sexual harassment complaint against Thomas and a desire to be through with that "mess." Moreover, Plaintiff reasonably questions why she, a claimed harassment victim, was the one reassigned to the distasteful and possibly dangerous work performed at Camp D. Therefore, the Court will deny Defendant's Motion concerning Plaintiff's retaliation claim regarding her assignment to Camp D.

### d. Disparate Treatment Claim

Plaintiff may also be attempting to raise a disparate treatment claim. However, as Defendant correctly observes, Plaintiff raised only sexual-harassment-related retaliation claims before the EEOC and did not mention race or disparate treatment. (Docs. 71-5, 71-6). Therefore, the EEOC had no reason to consider these claims, and they are unexhausted. *See Randel v. United States Dep't of Navy*, 157 F.3d 392, 395 (5th Cir. 1998); *Pacheco v. Mineta*, 448 F.3d 783, 791-92 (5th Cir. 2006). Moreover, even assuming that the Court could consider unexhausted claims, *see Baker v. McHugh*, 672 F. App'x 357, 360 (5th Cir. 2016), *cert. denied sub nom. Baker v. Speer*, 137 S. Ct. 1353 (2017) ("We note that Fifth Circuit case law contains some conflicting authority on the question of whether exhaustion of EEOC administrative remedies is jurisdictional in a Title VII case."), the Court cannot conclude on this very limited record that Plaintiff has pled a prima facie case of disparate treatment, particularly with respect to the treatment of "similarly situated

employees" under "nearly identical circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) (as part of prima facie case, racial discrimination plaintiff must show that he "was treated less favorably because of his membership in [a] protected class than were other similarly situated employees who were not members of the protected class"); *Torrez v. Milk Prods., L.P.*, 402 F. Supp. 2d 773, 778 (W.D. Tex. 2005) ("Plaintiff's argument that his supervisor, James Stein, was treated more favorably does not create a fact issue because Fifth Circuit precedent has set forth the very difficult requirement that employees' circumstances and misconduct be 'nearly identical.'"). Therefore, Plaintiff has failed to state a valid disparate treatment claim. Defendant's Motion will be granted with respect to any such claims.

### e. Punitive Damages

Finally, as Defendant correctly argues, punitive damages are unavailable in a Title VII action against a government or government agency. *See, e.g., Hunter v. Jefferson Par. Pub. Sch. Sys.*, 2017 WL 2910992, at *9 (E.D. La. July 7, 2017) (citing *Oden v. Oktibbeha Cty.*, 246 F.3d 458, 465-66 (5th Cir. 2001); 42 U.S.C. § 1981a(b)). Therefore, Defendant's Motion will be granted with respect to Plaintiff's claim for punitive damages. (Doc. 45 at 16).

### IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendant's Motion (Doc. 71) is **DENIED** with respect to Plaintiff's retaliation claim regarding her reassignment to Camp D. The Motion is **GRANTED** and Plaintiff's claims are **DISMISSED** in all other respects. Defendant's Motion is also **GRANTED** with respect to Plaintiff's claim for punitive damages, and that claim is **DISMISSED.**

Signed in Baton Rouge, Louisiana, on <u>December 11, 2017</u>.

_____
**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**